## LONDONER v. PEOPLE EX REL. BARTON.

| | |
|---|---|
| 15 | 557 |
| 19 | 88 |
| 15 | 557 |
| 13a | 560 |
| 15 | 557 |
| e28 | 149 |
| 15 | 557 |
| 134 | 328 |
| 15 | 557 |
| 35 | 246 |

1. DISCARDING ELECTION RETURNS — HOW POWER SHOULD BE EXERCISED.— While the existence of the power to discard the entire return of an election precinct is a public necessity and is sustained by the weight of judicial authority, it should be exercised with great caution and only as a *dernier resort.*

2. IRREGULARITIES DO NOT ORDINARILY WARRANT REJECTION OF ENTIRE POLL — PRESUMPTIONS.— The presumption that election officers have faithfully discharged their duties always obtains until the contrary is shown. The fact that illegal ballots have been cast, or that other irregularities have taken place, does not ordinarily warrant the rejection of the entire poll.

3. CHARACTER OF PROOF AUTHORIZING REJECTION OF ENTIRE POLL. But when it is clearly established that frauds subversive of the purity of the ballot-box and tending to nullify the popular will have been perpetrated by election officers, or have been perpetrated by others with their knowledge, connivance and consent, and the extent of such frauds cannot be disclosed with reasonable certainty, the entire return should be thrown out.

4. EFFECT OF REJECTION OF RETURN FROM AN ELECTION PRECINCT.— Upon the rejection of the return from an election precinct, the election therein does not necessarily become an absolute nullity; the burden of proof then shifts upon respondent to establish by evidence *aliunde* that a sufficient number of legal ballots were cast for him to secure his success.

5. CANDIDATE'S PARTICIPATION IN ELECTION FRAUDS NOT NECESSARY TO IMPEACHMENT OF THE RETURNS.— The impeachment and repudiation of election returns do not depend upon the participation or guilty knowledge of the candidate in whose favor the illegal votes are cast.

6. ORDER ON RELATOR IN QUO WARRANTO FOR LIST OF ILLEGAL VOTERS.— In a *quo warranto* case where an order is made on motion of respondent requiring relator to furnish a list of names of persons alleged to have voted illegally, it is a sufficient compliance therewith if he give the names of persons legally registered whose ballots were cast by others whose identity cannot be shown.

7. MAYOR'S OFFICE MAY BE TURNED OVER TO PRESIDENT OF BOARD OF SUPERVISORS.— Where a candidate for mayor is by the proper authority declared elected, files his oath of office and enters upon the discharge of his official duties without objection from the outgoing mayor, and is subsequently ousted in a *quo warranto* proceeding to which his predecessor is not a party, it is not material error for the court pronouncing the judgment of ouster to direct that the office be turned over to the president of the board of supervisors, who is

named by statute as the successor in case of a vacancy; although the constitution provides that the incumbents of municipal offices, unless removed according to law, shall exercise the duties connected therewith until their successors are "duly qualified."

8. A QUO WARRANTO PROCEEDING MAY BE PROSECUTED TO FINAL DETERMINATION AFTER RELATOR CEASES TO ADVANCE THE PECUNIARY MEANS.— A *quo warranto* proceeding instituted against the mayor by one who is a resident, a tax-payer and an elector within the city, the district attorney having refused, may be prosecuted to final determination though such relator afterwards ceases to advance attorney's fees and considers himself interested personally only "as any other citizen."

9. POWER OF COURT TO REFER QUESTIONS OF FACT TO JURY TRIAL.— The constitution does not declare that a jury may be either demanded or denied as a matter of course in the trial of civil cases. But by statute the court has power in a *quo warranto* proceeding to refer specific issues or questions of fact to a jury for trial.

10. FACTS JUDICIALLY NOTICED IN CHALLENGE TO ARRAY OF JURORS.— In considering the sufficiency of a challenge to the array of jurors called to try special issues in a *quo warranto* proceeding, the court may take judicial notice of the fact that relator is the sheriff, as well as of statutes defining that officer's duties.

11. WHERE SPECIAL VENIRE FOR JURORS MAY BE ORDERED.— And it is not error in such case to order a special venire for jurors, who are to return simply advisory findings, to be served by the coroner, even though "more than sufficient" to try the cause of the regular panel remain.

12. REGULAR JURY MAY MAKE SPECIAL FINDINGS.— Jurors sworn to well and truly try the matters at issue may make any special findings of fact raised under the pleadings, and need not be re-sworn during the trial if the pleadings are not changed.

*Error to District Court of Arapahoe County.*

AT a municipal election held in April, 1889, relator Barton and respondent Londoner were opposing candidates for the office of mayor of the city of Denver. The returns showed an apparent majority for respondent, who was duly declared elected, received his certificate of election, took the requisite oath, and entered upon his official duties. Relator at once instituted the present proceeding, and a demurrer to his complaint or petition was sustained. But on a former review by the supreme court it was held that

while an election contest proper was, under the circum-
stances, not maintainable, the pleading in question contained
averments sufficient to lay the foundation for a proceeding
in the nature of *quo warranto*, and that in pursuance thereof
the title of respondent might, on behalf of the people, be
thus investigated. The cause went back to the district
court, the issue mentioned was made, and, upon trial, judg-
ment of ouster was rendered against respondent. To re-
verse this judgment the present writ of error was sued out.

The special findings of the court contain the following,
among other, conclusions of fact: " That with respect to the
conduct of said election upon said 2d day of April, 1889, in
the eighteenth, nineteenth and thirtieth precincts of said
city, and in each and every of said three precincts, upon
the evidence introduced upon the trial of said cause, and
upon the findings made by the jury with respect thereto,
the court finds that certain persons combined and confed-
erated together to procure the casting of illegal ballots for
the defendant for said office of mayor; that such persons
did procure to be cast for the defendant for the office of
mayor fraudulent and illegal ballots in the eighteenth pre-
cinct, to the number of about two hundred and ten, in the
nineteenth precinct about two hundred and twenty, and in
the thirtieth precinct about two hundred and fifty; that it
is not possible to estimate or calculate with reasonable
certainty the number of illegal ballots cast in either the
eighteenth, nineteeth or thirtieth precincts for the defend-
ant for the office of mayor; that fraud was practiced in
each of said three precincts in the conduct of said election,
and such fraud culminated in the deposit of illegal votes in
the ballot-boxes in each of said precincts, and the same
were counted, returned and canvassed; that such illegal
votes amounted to about the following in number, to wit:
In the eighteenth precinct, to about one hundred illegal
votes; in the nineteenth precinct, to about one hundred
illegal votes; and in the thirtieth precinct, to about one
hundred and fifty illegal votes; that the casting, counting
and returning of said illegal votes was done with the knowl-

edge of some of the election judges in each of said precincts, and the acts of such judges of election in so receiving, counting and returning such illegal votes were knowingly, wilfully and deliberately done; that the conduct of the judges of election at each of said three precincts was not fair or faithful in receiving legal votes, and rejecting illegal votes; that fraud was practiced in the conduct of said election in each of said three precincts, and some of the judges of election participated in such fraud in each of said three precincts; that the judges of election receiving ballots in each of said three precincts connived at, consented to, acquiesced in, and knowingly permitted the casting of illegal votes at said election for the office of mayor; that the judges of said election, receiving ballots in each of said three precincts, negligently and carelessly permitted the casting of illegal ballots for the office of mayor; that the judges of election, receiving ballots in each of the said three precincts, intentionally disregarded challenges offered against illegal votes, and such disregard led to the deposit of illegal votes in each of said three precincts; that the judges of election, receiving ballots in each of said three precincts, received votes without challenging the persons offering them, or requiring such persons to be sworn after receiving reasonable and credible notice that such persons were not entitled to vote, or that they were voting upon the names of other persons, or that they had voted before; that votes were cast at said election for the defendant for mayor by persons on the names of persons other than themselves, in each of said three precincts, to the number of about one hundred in the eighteenth, and about one hundred in the nineteenth, and about one hundred and fifty in the thirtieth precincts; that the judges of election in the thirtieth precinct refused to permit persons entitled thereto to inspect the register list of said precinct for the purpose of preparing a challenge book; that the police officers, or some of them, who were present at the polling places in each of said three precincts, connived at the casting of illegal votes for mayor and interfered to prevent the challenging of illegal voters, and by force or threats pre-

vented the challenging of illegal votes at said election; that the polling place in the said thirtieth precinct was so boarded up that the voters, when casting their ballots, could not see the ballot-box or the persons in the room other than the judge who was receiving the ballots, nor could the by-standers or citizens immediately in front of the polling place see the ballot-box or the persons in the room other than the judge who was receiving the ballots, nor could the voters when voting, nor the by-standers or citizens immediately in front of the polling place, see what disposition was made of the ballots after they were handed to the election judge; that said polling place was so boarded up by the order of the then chief of police of the said city of Denver, and in the interest of the candidacy of the defendant for mayor; that the public registry list in said thirtieth precinct was torn down and taken away by a police officer of said city of Denver, and working at said election in the interest of defendant for the purpose of preventing persons from making a challenge book to be used at said election; that Matthew Finehart and one —— Wenning acted as clerks of election at said election in said thirtieth precinct, and neither said Finehart nor said Wenning was an elector in or of said thirtieth precinct; that in said eighteenth precinct, during the progress of said election, the said Elias R. Barton, as a candidate for said office of mayor, presented to one of the judges of election in said precinct, and who was then receiving ballots thereat, a written request, addressed to the judges of election at said precinct, that J. N. Douglas, a friend of said Barton, be permitted to be present within the polling place while the ballots were being received and counted, and said judge peremptorily refused and denied such request."

Messrs. Lucius P. Marsh and L. C. Rockwell, for plaintiff in error.

Messrs. Penoe & Penoe and Sam P. Rose, for defendants in error.

Chief Justice Helm delivered the opinion of the court.

The extraordinary conclusions of fact embodied in the findings of the trial court were predicated upon a solemn, fair and extended judicial investigation, and are in substantial accord with the answers of the jury to questions propounded. We are bound to regard them as amply sustained by the proofs — *First,* because only a small portion of the evidence is before us, and inquiry on our part into its sufficiency is therefore precluded; and *second,* because this sufficiency is admitted, the record reciting that " respondent makes no point, and does not claim, that the verdict of the jury is contrary to the evidence."

The findings mentioned refer to frauds perpetrated in three specified election precincts within the city of Denver. The following is a brief epitome of these findings in so far as they bear upon one branch of the subject in hand: That the conduct of the *election judges* was neither fair nor faithful; that they knowingly, wilfully and deliberately received, counted and returned illegal votes for respondent; that they purposely disregarded challenges offered against fraudulent votes; that they refrained from challenging or swearing, as required by law, persons tendering ballots, after reasonable and credible notice that such persons were not entitled to vote, or that they were voting on the names of other citizens, or that they had voted before, and were therefore repeaters; that they refused to permit persons entitled thereto to inspect the registry list for the purpose of preparing a challenge book; and that, in defiance of statute, they deliberately denied the request of relator, who was a candidate, to have a friend admitted into the polling place to witness the receiving, depositing and counting of votes. That the *police officers* of the city, acting in the interest of respondent, connived at the casting of illegal votes; wrongfully interfered, and by force or threats prevented the challenging of illegal voters; boarded up one of the polling places so that persons offering their ballots, and citizens im-

mediately in front, could not see the ballot-box, or know the disposition made of the ballots when handed to the election judges; tore down and took away the registry list in order to prevent the preparation of challenge books; and otherwise obstructed an honest election.

In addition to the foregoing, it further appears from the findings in question that although "about" three hundred and fifty votes were shown to have been fraudulently cast for respondent by individuals upon the registered names of other persons, yet it was not possible to estimate or calculate with reasonable certainty the whole number of illegal ballots which, through the official misconduct mentioned, were deposited and counted, or the number so received and returned for respondent.

Upon the record thus made the court declined to consider the returns from the precincts in question; and, respondent's election being thereby defeated, a judgment of ouster followed.

If it be proper under any circumstances to reject the entire poll of an election precinct, this would seem to be a case justifying such action. In large cities illegal votes will frequently find their way into the ballot-box, despite the utmost vigilance and honesty of election officials; but, with strict integrity in the management of elections, the danger in this regard may be reduced to the minimum, and a reasonably fair expression by the qualified electors be secured. When, however, the men whose sworn duty it is to superintend and conduct the receiving, depositing, counting and returning of votes become active participants in a conspiracy to secure dishonest and fraudulent results, confidence in the potency and purity of the ballot can no longer exist. Considered with a view to the public weal, this offense cannot be characterized with sufficient severity, nor can the magnitude of the threatened danger be fully realized. The crime of the illegal voter is venial, and his act harmless, in comparison. Such conduct renders futile the attempt to express the popular will through the ballot-box. Elections

thus conducted become the medium whereby corrupt and designing men, almost with impunity, carry out their conspiracies against the rights of the people and the public interests.

The exigency calls for a more radical and effective remedy than is furnished by provisions for punishing the corrupt officials. If, despite serious and discouraging difficulties, criminal convictions be sometimes secured, the public injury inflicted is not repaired, and the menace to the public welfare loses but a small part of its gravity.

The existence of the power to discard the entire return is a public necessity, and its exercise under proper circumstances is sanctioned by the overwhelming weight of judicial authority. But since the employment of this power always results in the nullifying of legal, as well as illegal, votes unless the legality be shown by proof outside the return, it should be invoked with caution and as a *dernier resort*. The injury suffered by the legal voter is tolerated for the public good alone; and then, only, when the integrity of elections cannot be otherwise assured. The presumption that officers charged with the duty of conducting elections have in good faith fulfilled the resulting obligation always obtains until the contrary is shown; and the fact that illegal ballots have been cast, or that irregularities in the management of the election have taken place, does not ordinarily warrant the application of this remedy. But when it is clearly established that frauds subversive of the purity of the ballot-box, and tending to nullify the popular will, have been perpetrated by election officers, or have been perpetrated by others with their knowledge, connivance and consent, and the extent of such frauds cannot be disclosed with reasonable certainty, the integrity of the entire return is destroyed, and it should be rejected. Judge McCrary states the proposition even more broadly. He says: "The safe rule, probably, is that where an election board are found to have wilfully and deliberately committed a fraud, even though it affect a number of votes too small

to change the result, it is sufficient to destroy all confidence in their official acts, and to put the party claiming anything under the election conducted by them to the proof of his votes by evidence other than the return." McCrary, Elect. (3d ed.) § 541 *et seq.*, and cases cited. And he declares the same rule applicable when the integrity of returns is destroyed by misconduct of the officials, consisting in " a reckless disregard of the law, or in ignorance of its requirements," though no corrupt purpose be affirmatively shown. Id. § 540. " The returns will not be rejected until they have been shown to be so tainted with fraud, or so radically defective or incomplete, that the truth cannot be deduced from them. Where this is shown, however, the returns will be ignored." Mechem, Pub. Off. § 227, and cases cited.

It is not necessary, after what has been said, to further comment upon the sufficiency of the facts before us to justify the application of the foregoing rule. In consulting authorities upon the subject, including decisions not cited by McCrary or Mechem, we have found no instance where the extent of the official misconduct surpasses that disclosed in the case at bar.

But the rejection of the returns from the three precincts named did not necessarily defeat respondent's election. The burden of proof then shifted, and it devolved upon him to establish, by evidence *aliunde*, that, notwithstanding the illegal voting and other frauds proven, a sufficient number of legal ballots were cast for him to insure his success. Mechem, Pub. Off. § 229; McCrary, Elect. § 535. We are not advised, however, that he offered any extrinsic proofs whatever for the purpose of discharging this burden.

Counsel for respondent, both in their printed brief and in oral argument, assert that respondent is not shown to have been in any way connected with the illegal and disgraceful conduct disclosed in this case. The assertion is not controverted by opposing counsel. And in justice to respondent we should state, before leaving this branch of the case, that there is nothing in the seventy-five answers of the jury to

as many questions prepared by counsel for relator, or in the twenty-seven findings of fact by the court, or in the pleadings, or in any other part of the record before us, which shows that he himself assisted in or sanctioned the frauds proven, or that he had any knowledge thereof. Although these frauds were perpetrated in his interest, so far as appears from this record, he may have believed, until the contrary was proven at the trial, that his election was conducted in a fair and honorable manner, and that he had received the legal majority appearing on the face of the returns. But these facts, while tending to establish a personal vindication, cannot change the result of the judicial inquiry; for the impeachment and repudiation of the returns do not depend upon the guilt or innocence of the candidate. Mechem, Pub. Off. § 227.

But counsel for respondent earnestly and ably contend that, by virtue of certain irregularities and rulings precedent to and connected with the trial, their client's interests were so prejudiced as to render necessary a reversal of the judgment. We shall consider these objections as briefly as may be consistent with a fair reply to the arguments adduced to support them.

Before the trial commenced, respondent filed a motion asking that relator be required to furnish a list of the names of those persons, in each of the precincts mentioned, alleged to have illegally voted for him. This motion was sustained, and an order accordingly entered. In response thereto, relator furnished the names of persons, legally registered, upon which ballots for respondent were cast by men falsely personating the voters thus registered. During the trial, testimony was admitted, over respondent's objection, showing that "about" three hundred and fifty of the votes polled for him in those precincts were received from this class of fraudulent voters. It is claimed that the notice was not in compliance with the court's order, and was wholly insufficient to justify the admission of these proofs.

If counsel's contention in this regard be correct, such

frauds as the one in question might be perpetrated with impunity; for, when the illegal voter has cast his vote in the name of a legally registered elector, it will generally be impossible to learn his true name. In elections like the one now under consideration, where thousands of votes are polled, and where most of the men who perpetrate frauds of this kind belong to the criminal class, or are transients, and have no regular place of abode, it is practically impossible to discover their whereabouts and make known their identity. The purpose of the court's order in the premises was to inform respondent what particular votes were regarded by relator as fraudulent, so that he might prepare himself with the requisite testimony, if existing, to disprove the averment; and, when the names upon which illegal votes had been polled were given, the information was as complete as the nature of the particular fraud reasonably allowed. With this notice, respondent could not have been greatly surprised, and his facilities for investigation were but little, if any, inferior to those of relator. The order was sufficiently complied with; and, had the court refused to receive the evidence in question, error would have been committed.

The judgment directed that respondent "do forthwith yield and deliver up to the president of the board of supervisors," the said office of mayor, together with all books, papers, keys, furniture, etc., belonging thereto. This mandate is challenged as erroneous. It was undoubtedly made in obedience to the supposed requirement of section 11, page 90, Session Laws of 1885, which reads: "In case of a vacancy in the office of mayor, or in case the mayor shall for any reason be temporarily unable to perform the duties of the office, the president of the board of supervisors shall act as mayor." The charter of Denver provides that the mayor shall hold his office for the period of two years. Sess. Laws, 1885, p. 88; Sess. Laws, 1887, p. 85. It contains no clause directing that he continue until his successor qualifies. Counsel for respondent are mistaken in assuming

that section 1, page 98, Session Laws of 1885, applies to the case in hand. The language therein, providing for the holding over of municipal officers, is expressly limited to those serving or elected in 1885.

The constitution (art. 12, § 1) is, however, broad enough to include this position. It says, *inter alia:* "Every person holding any civil office under the state or any municipality therein shall, unless removed according to law, exercise the duties of such office until his successor is duly qualified." Under this constitutional provision the incumbent of the office, at the time of respondent's installation, was entitled to remain until his successor was "duly qualified." It appears that respondent was by the proper canvassing board declared duly elected; that he filed his oath of office, took all the formal steps necessary to constitute the prescribed "qualification," and entered upon the discharge of his official duties. It may be that thereupon the constitutional requirement was satisfied; but if the fact, since revealed, that respondent was not duly elected, vitiates, by virtue of the constitution, the alleged "qualification," still we cannot say that the judgment of the court in the premises is fatally defective. The preceding mayor is not a party to this action, and is not complaining. The record affirmatively shows that he not only voluntarily issued to respondent the proper certificate attesting his election, but also, in like manner, vacated the office, and turned over to respondent all papers, books, documents, furniture, etc., belonging thereto. Relator, who was the opposing candidate, could not be installed. *People v. Londoner*, 13 Colo. 303. Under these circumstances there is, in our opinion, no question but that upon entry of the judgment of ouster, upwards of a year later, the clause of the charter above mentioned became operative. A vacancy, within the meaning of this provision, then existed, to be filled, for the time being at least, by the president of the board of supervisors.

Had the outgoing mayor been a candidate for re-election, and had he refused to turn over the office or recognize his

successor until forcibly dispossessed, the situation would perhaps have been different, and a different question might be presented. But even under such circumstances this case would not be parallel to that of *United States v. Addison*, 6 Wall. 291, relied on by respondent. For it appears in that case that the relator, Crawford, was found to have been duly elected by the proper canvassing board, and that the city council of Georgetown, in violation of law, refused him recognition, illegally assumed to examine or recount the vote, declared Addison, his opponent, elected, and installed him into the office; whereupon Crawford instituted the proceeding in which the decision was rendered, by information in the nature of *quo warranto*. It appears, further, that the statute there under consideration not only provided that the incumbent should hold until his successor had qualified, but contained also the further declaration that he should remain until his successor was " duly elected."

Had the court, in the case at bar, rendered a judgment of ouster simply, the statute would have supplied an incumbent. The fact that the judgment mentions the statutory successor does not destroy its validity. Relator cannot complain; and, if one not a party to the record believes himself injured, he is not estopped from asserting his claim in the proper legal forum. The objection now under consideration must be declared invalid.

Relator was a resident, a tax-payer and an elector within the city; and upon refusal of the district attorney to institute this proceeding, when requested by him, relator was undoubtedly authorized to do so himself. Civil Code, 289. The subsequent discovery of the fact that he could not be installed into the office did not render him incompetent to continue the suit as relator, or permit such continuance. It is true, he admitted upon the trial that he was not then employing counsel or advancing costs, and did not expect to incur any further liability in the case; but, in response to a question, he indicated that he was still interested personally " as any other citizen." And it does not appear

that he requested a discontinuance, declined to allow the further use of his name, or in any legal way attempted to relieve himself from the responsibility connected with his position as the original moving party, or from the financial liability resulting. The motion interposed, after the former judgment by this court, to dismiss the action on the ground that there was no proper party complaining, and hence no warrant or authority of law for its further prosecution, was correctly denied.

Respondent objected to the calling of the jury, and insisted upon a trial by the court. The court ultimately, as we have seen, made his own findings of fact, and entered judgment accordingly. It is doubtful, therefore, if respondent could have been so prejudiced by the participation of the jury as to justify us in now listening to his complaint in this regard. *Pfeiffer v. Riehn*, 13 Cal. 643. But we do not consider the court's action in the premises improper. Our constitution does not declare that a jury may either be demanded or denied as a matter of course in the trial of civil cases; hence this is a proper subject for statutory regulation. The present proceeding clearly belongs to one of the classes of actions referred to in the last clause of section 173, Civil Code. This code provision expressly recognizes the power to refer any specific issue or question of fact to a jury for trial. To this extent those proceedings at law covered by the statute are thus made similar to suits in equity; and the court in this case possessed authority to invoke the assistance of a jury.

A special *venire* for jurors having issued, respondent challenged the array on the ground that the regular panel was not exhausted, and there remained in attendance " more than sufficient " to try the cause. This challenge was overruled, though no issue of law or of fact was formally tendered in writing. We must regard the ruling as based upon a demurrer *ore tenus* to the petition, and as predicated upon the issue of law thus raised.

In considering the sufficiency of the petition, the court

doubtless took judicial notice of the statutes pertaining to the subject involved, and also that relator, one of its officers, was the sheriff. *Coon v. Rigden*, 4 Colo. 275. The record recites that, "the sheriff of said county being relator herein, the court ordered an open *venire* to issue to the coroner," etc. By statute, the sheriff is required to assist in drawing from the box provided, the names of jurors to constitute the regular panel. It is also, in like manner, made his duty to serve the regular *venire* then issued, as well as subsequent special *venires* under which his choice is generally uncontrolled. By statute, also, the coroner is directed to serve all processes when the sheriff is a party to the cause. Had respondent, under the circumstances, objected to the regular panel, and moved for a special *venire*, the court might properly have sustained the objection and motion; though we do not say that, had he overruled the same, his action, in the absence of fraud or misconduct, would necessarily have been error. But the order in question was calculated to secure a more impartial investigation; and the people, being a party to the record, and profoundly interested in the result, were entitled to consideration as well as respondent. It must be remembered that the jurors were not called upon to try the case, as in ordinary legal actions. Their findings, as already indicated, were simply advisory and did not control the decision. Moreover, the fact is perhaps worthy of mention in passing, though of course not decisive, that there is no averment in the petition, nor any pretense otherwise, that respondent was in the slightest degree prejudiced by the issue of the special *venire*. We shall decline to reverse the judgment upon this objection.

The jurors were summoned "for the trial of such issues as might thereafter be submitted to them by the court;" but the ordinary oath, "to well and truly try the matters at issue, * * * and a true verdict render, * * *" was administered. This oath is prescribed by statute, and under it a general or special verdict may be returned; or, in cases where general verdicts are rendered, special find-

ings of fact may also be required, the latter controlling the general verdict, if inconsistent therewith. Civil Code, §§ 198, 199. " The usual oath taken by jurors includes any issue between the parties submitted to them on the trial of the cause." Thomp. & M. Juries, § 292. There was in the present case no amendment of the pleadings after the trial began; hence the issues could not have been changed, and no necessity existed under any of the decisions, so far as we have examined them, for reswearing the jury. Id. and cases cited. The cases of *Kerschbaugher v. Slusser*, 12 Ind. 453, and *Hoot v. Spade*, 20 Ind. 326, mentioned by counsel for respondent, differ from the one at bar in this important particular, and therefore have no application.

The complaint upon which the trial took place unquestionably states a cause of action. The averments are sufficient to sustain the findings and judgment. If a few of its numerous paragraphs incidentally allege conclusions of law, or contain matters touching relator's eligibility and his claim to the office, such matters may be regarded as surplusage. They did not affect the substantial rights of respondent; and, while they might have been stricken out, we do not deem their presence of sufficient importance to warrant interference by us at this stage of the proceedings.

The case seems to have been tried with unusual care, and we find nothing in the record that justifies a reversal. The judgment is accordingly affirmed.

*Affirmed.*