[No. 4930.]

THE PEOPLE EX REL. THE ATTORNEY GENERAL V. TOOL ET AL.

35  225
e37  460

1. **Equity Jurisdiction—Injunction to Prevent Crime—Parties.**
Equity will afford protection by enjoining the commission of crime, when rights and interests are injuriously affected thereby, and actions for that purpose may be maintained by those whose rights or interests are injuriously affected or upon whom devolves the duty of protecting such rights and duties.

2. **Same.**
The state has the right to appeal to the supreme court as a court of equity for a determination and exercise of its powers

by an appropriate process to prevent wrongs which, in its sover-
eign capacity, it is its duty to prevent.

**3. Same.**

Individuals cannot invoke the power of a court of equity
to enjoin the commission of illegal acts on the ground that they
injuriously affect the public interests, but the state in its sover-
eign capacity as parens patriae has the right, and it is its duty
to protect its citizens when they are incompetent to act for
themselves, and it may maintain an action to prevent the con-
summation of. threatened combinations and acts which will
deprive the people of their liberties, rights and privileges ·as
citizens, although such combinations and acts would constitute
crimes.

**4. Same—Elections.**

The state upon the relation of the attorney general may
invoke the powers of the supreme court for a writ of injunction
to prevent the judges of election and other officers in control of
an election from committing and from permitting others to com-
mit frauds at such election and to secure a judicial enforcement
of the statutes relating to elections so as to prevent the perpetra-
tion of such frauds.

**5. Injunction—Contempt—Trial by Jury.**

A court having jurisdiction to issue an injunction has the
inherent power ·to punish for contempt those who violate its
mandates, and the right of trial by jury does not extend to
charges for contempt.

**6. Elections—Injunctions to Prevent Frauds—Judicial and Politi-**
    **' cal Questions.**

In an application for a writ of injunction to restrain the
judges of election and other officers in control of an election
from committing and from permitting others to commit frauds
at such election which it is alleged will be committed unless
prevented by such injunction, the questions presented are purely
judicial and not political.

**7. Elections—Injunction—Jurisdiction.**

The supreme court has original jurisdiction to issue a writ
of injunction upon the application of the state, to prevent the
judges of election and other ·officers in control of an election
from committing or permitting others to commit frauds at such
election.

**8. Injunction—Denials—Practice.**

Denials of the averments of a bill upon which the right to
injunctive relief is based does not necessarily require the
refusal of the writ. The comparative injuries which may result

to the contending parties by granting or refusing the writ may be considered. Denials may also be disregarded when the respondents do not assert a right to commit the acts sought to be enjoined.

ON MOTION TO PREVENT THE CANVASSING OF RETURNS.

9.  Equity Jurisdiction—Injunction—Elections—Frauds—Canvass-
    ing Returns.

A court of equity having assumed jurisdiction and issued a writ of injunction to prevent frauds at an election may effectuate its orders made to prevent such frauds by restraining the election commission from canvassing the returns from precincts where it appears that in violation of the court's mandate such frauds were committed that the returns are absolutely false and that the truth cannot be deduced from them.

ON MOTION.

10.  Elections—Canvassing Returns—Tally Lists—Certificates.

In canvassing election returns where there is a discrepancy between the tally list and the certificate of the judges and clerks of election as to the number of votes any candidate received, the certificate only can be considered and cannot be changed by the canvassers by reference to the tally list.

Mr. JOHN M. WALDRON, Mr. THOMAS WARD, Jr., and Mr. H. J. HERSEY, for petitioners.

Mr. CHAS. J. HUGHES, Jr., Mr. S. W. BELFORD, Mr. H. M. TELLER, Mr. C. S. THOMAS, Mr. T. J. O'DONNELL, Mr. PHILIP HORNBEIN and Mr. JOHN G. TAYLOR, for respondents.

*Original Proceeding.*

The purpose of this proceeding, instituted by the people of the state of Colorado on the relation of the attorney general and others, petitioners, is to obtain such relief as will secure an honest election in certain precincts of the city and county of Denver, by preventing frauds which, it is said, certain of the respondents will commit at the general election to be held on the 8th day of November, 1904, and which, in a measure, will be consummated by frauds already

perpetrated. To this end it is sought to obtain an order of this court which will require these respondents to observe the law relating to elections. It appears from the averments of the bill that one of the relators is a candidate of the Republican party for the office of governor, and the other the chairman of the state central committee of that political organization. The judges of election in the precincts designated, the fire and police board, the sheriff, the chief of police, the chief of the fire department, the members of the election commission, the chairman of the Democratic central committee of the city and county of Denver, and the chairman of the Democratic state central committee of the state, are named as respondents. The bill charges that a majority of the members of the election commission are Democrats, and that two out of three election judges in each precinct have been appointed by the majority members, and that such judges, the members of the commission appointing them, and the other respondents, except the Republican member of the election commission, have conspired and confederated to prevent a fair and open election at the next ensuing general election, and to defeat the will of the people as lawfully expressed at the polls, and to this end have caused many thousands of false, fraudulent and fictitious names to be entered upon the registration lists which will be certified to the judges of election for use in such election. The bill further charges that the respondents engaged in the conspiracy threaten, with physical violence and arrest on fictitious charges, the Republican judges of election appointed by the minority member of the election commission, in order to prevent them from serving, and by other fraudulent practices to bring about vacancies which may be filled by membership from the Democratic party, and thus prevent the Republican party from having a

representation as judge in the several precincts, and through this means secure both clerks of election in such precincts. The bill also charged that as a part of the plan to prevent a fair election, it was the purpose of the majority of the election judges, the election commission and the other respondents to refuse to allow watchers and challengers of the Republican party to be present at the polling places, to which they may be appointed for the purpose of challenging votes, and watching the count, and that the fire and police board and other peace officers named as respondents will, unless restrained, eject such watchers and challengers from the polling places. It is also alleged that in the recent past gross frauds at the elections in these precincts have been perpetrated, but that the perpetrators have gone free, without any attempt on the part of the peace officers named as respondents to arrest or bring them to justice.

It is also charged that it is the purpose of the peace officers mentioned as respondents to permit the practices heretofore indulged in to be repeated at the ensuing election, and to over-awe and intimidate reputable citizens desirous of securing a fair and honest election and to prevent fraud thereat, by driving them away from the polling places or, at least, afford them no protection as against wicked and vicious persons who will congregate at such polling places to intimidate such citizens, so that they may not witness, or in any manner prevent, the frauds contemplated.

It is also alleged that the respondent judges and the clerks engaged in the conspiracy pretend and claim to have the right to exclude from the polling places all challengers and persons other than the judges and clerks of election after the polls shall be closed and during the counting of the ballots, and the making of the returns thereof, and threaten, and

intend to, and will, unless restrained, exclude all persons during this time, so that neither watchers nor challengers will be permitted to witness the count and the making up of the returns. It is further alleged that it is the purpose of the respondents charged with the conspiracy to prevent a fair and honest election to permit the false and fictitious names on the registration lists to .be voted for the Democratic candidates, and to make use of such fictitious names by having them placed upon the poll books in advance, and deposit ballots in the ballot boxes to represent these names. It is also charged that it is the purpose of the conspirators to cause gangs of armed and wicked men to vote as repeaters and personators, and by threats and intimidation, prevent the representatives of the Republican party from discharging their duty, or reputable electors and citizens from visiting the polling places in order to gather evidence of the disreputable practices which, it is alleged, the conspirators will indulge in unless restrained. It is also charged that the campaign is heated and intense; that the alleged acts which it is claimed the conspirators will commit have been committed by them in the recent past, and that the temper of the public is such that, if they are permitted at the ensuing general election, riot and bloodshed may occur.

·The prayer of the complaint is to the effect that an injunction issue, restraining the respondents from committing the illegal acts which it is said they contemplate committing; that the injunction, by its mandate, specifically direct that the election officials comply with the law in the conduct of elections, and that two watchers in each of the several precincts be appointed by this court for the purpose of observing how the election in these precincts is conducted.

To this bill the members of the fire and police board, the sheriff, the chief of police, the chief of the fire department, the chairman of the Democratic central committee of the city and county of Denver, and the chairman of the state central committee of the Democratic party of the state answered, by which they challenged the jurisdiction of the court to determine the issues presented by the bill; claimed that it did not state facts sufficient to constitute a cause of action, and that the relief sought was in conflict with section 5, article II of the constitution, which provides that "All elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." They further answered, denying the conspiracy charged or purpose upon their part to commit any of the threatened illegal acts mentioned in the bill. The election commission also filed an answer to the same effect.

CHIEF JUSTICE GABBERT delivered the opinion of the court.

The object of this proceeding is to prevent the carrying out of a conspiracy to commit illegal and fraudulent acts which would result in the pollution of the ballot box. It is instituted on behalf of the people on the information of the attorney general. According to the averments of the bill, a wide-spread conspiracy exists which, if not frustrated, will deprive the people of the constitutional right to an open, fair and honest election; that officials upon whom devolves the duty of conducting the election are engaged in this conspiracy, and that part of the nefarious scheme has already been consummated, in that thousands of fictitious names have been placed upon the registration lists which it is the purpose of the conspirators to have voted by repeaters and

personators, with the connivance of judges and
clerks of election. In short, that officials and instru-
mentalities of the state in control of the election ma-
chinery in the precincts mentioned have committed,
and purpose to commit, frauds, in the way of per-
mitting repeating and personating, and in counting
the votes and certifying the returns which will ren-
der the election in these precincts a mere farce. The
general purpose and scope of the relief demanded is
to secure a judicial enforcement of the statutes relat-
ing to elections, so as to prevent the perpetration of
these frauds. In other words, to require the re-
spondents engaged in the conspiracy to commit the
frauds contemplated to refrain therefrom by simply
conducting the election honestly, and obeying the
laws prescribed for the conduct of elections.

As reasons why this relief cannot be granted, it
is contended on the part of respondents that, al-
though the frauds charged may be perpetrated, the
most sacred rights of the citizens violated and the
election laws of the state set at naught, they cannot
be enjoined from committing them because the com-
mission of crimes may not be enjoined; that these
frauds may be reached after their perpetration by
the prosecution and conviction of those guilty of
committing them and through election contests; that
political questions only are involved, and that the
exercise of jurisdiction by this court in the premises
would, in effect, amount to an assumption of powers
which it does not possess.

The cardinal principle of our government is
that it shall be controlled by the people through the
medium of the ballot box. Destroy this right, and
the government itself is destroyed. The people are
entitled to have an election honestly conducted, and
the ballots cast honestly counted. The vote of the
precincts in question constitutes a very considerable

proportion of the entire vote of the state. The purity of the ballot box is threatened. The integrity of the election about to be held will be questioned. If these frauds are perpetrated, if they cannot be prevented, then the entire state, so far as the election is concerned, is practically at the mercy of those who control the election machinery in the city and county of Denver. The will of the people will thus be subverted by the acts of those who achieve this end by the commission of frauds which will result in depriving the people of their just rights. The relief demanded does not contemplate that a single right of the respondents will be infringed, or an act required of them which the law does not impose or require, for an observance of the mandates of the injunction prayed will require of the respondents nothing more or less than that they conduct an honest election in accordance with, and under the safeguards prescribed by the laws of the state. As far as reported cases are concerned, relief of the character contemplated has not been granted or denied upon the facts disclosed by the bill, but it does not follow by any means that there are no precedents or authorities which are applicable or controlling. Precedents illustrate principles. They serve to demonstrate how and when they have been applied, but the true precedent is the correct principle applicable to the facts of a particular case. Whether or not the objections urged against the bill are good, and whether the relief demanded shall or shall not be granted, will be determined by a discussion of the power of the state to protect the people in their constitutional rights and liberties, and the authority of this court in equity, when appealed to by the state in its sovereign capacity to grant relief which will afford such protection.

Suits may be maintained by private parties to restrain crimes when their commission will injuriously affect their property rights. This is permissible because interests are affected which the individual may thus protect. The state may restrain crime when its interests or the interests of those entitled to its protection, are injuriously affected. For this reason it has been said that equity jurisdiction is divided into two branches: One which may be invoked by the state to redress and prevent public wrongs, and the other by private persons to prevent and redress private wrongs.—*Attorney General v. R. R. Co.*, 35 Wis. 425. In reality, however, there is no such distinction, for the basic principle in each branch is the same—that is to say, equity will afford protection by enjoining crime when rights and interests are injuriously affected thereby. In applying this principle, the distinction between the state and the private individual must be borne in mind, for this constitutes the distinguishing feature of the cases on the subject as between the sovereign power and the individual, not because of a difference in principle, but because of the difference in the rights, powers, duties and interests of each. In short, the principle applicable to actions of the character under consideration is, that they may be maintained by those whose interests or rights are injuriously affected or upon whom devolves the duty of protecting such interests and rights. All sovereign powers not limited by the federal constitution are vested in the states, except so far as the people of the respective states may have abridged these powers by their respective constitutions.—Sutherland's Notes on U. S. Constitution, 677. Sovereignty of a state embraces the power to execute its laws and the right to exercise supreme dominion and authority, except as limited by the fundamental law.—2 Bouvier (Rawle's

Rev.) 1016, Anderson's Law Dict. 960. These powers are exclusive and essential. It has been the boast of every political organization advocating policies entitled to consideration that the redress for wrongs was through the peaceful means of the ballot box. The constitution provides that all elections shall be free and open. The respondents, although appealing to this provision as a reason why this action cannot be maintained, are themselves guilty of acts —or, according to the averments of the bill, will commit acts—which, in spirit and in fact, will not only be a violation of the very law to which they appeal, but will render it nugatory. The state, in its sovereign capacity, by the very terms of its being, is entrusted with powers and duties to be exercised and discharged for the general welfare and for the protection of the rights and liberties of its citizens. In the exercise of these powers and in the discharge of these duties it is not restricted in the remedies which it may employ. The interest of the state in a pure election is not limited to the protection which may be afforded by the punishment of those, through criminal prosecutions, who violate the laws relating to elections by padding registration lists, permitting repeating, and falsifying election returns. If a conspiracy of the magnitude charged exists to commit frauds violative of the most sacred rights of the citizens of the state, then any attempt to prosecute and convict the wrong-doers would be futile. If, then, the state, in order to secure an honest election, should be limited to the prosecution and punishment of those who might be guilty of the frauds charged, the people of this commonwealth are at the mercy of those who have combined to commit these frauds. Government is not such a failure; the state is not so impotent. The result to be accomplished by a proceeding which the state may institute, rather than its

character, constitutes the test of its power. It has the right to appeal to this court for a determination and exercise of its powers by an appropriate process, to prevent wrongs which, in its sovereign capacity, it is its duty to prevent. Certainly, no good reason can be advanced why it is not as wise for the state, by means of a civil action, to prevent an offense, injuriously affecting its rights or the liberties of its citizens, as it would be to wait and punish, or attempt to punish, the offender for a crime after it has been committed.

It is the undoubted duty of the state to preserve, pure and unimpaired, every channel through which powers are exercised necessary for the protection of the rights and liberties of its citizens. Deny this power, and the supremacy of the state government is denied. The rights of citizens which will be impaired if the frauds threatened are committed, are of the most vital importance. If not prevented, then the interests of the state, as well as the interests of those whom it is bound to protect, will be injuriously affected. The power which the state may exercise in such circumstances is wholly independent of other remedies at law. It is the function of the attorney general, by information, to protect the rights of the public, and, in so doing, he has the right to resort to the more lenient remedy of injunction to prevent wrongs against the public rather than wait until after their commission, and then seek to punish the wrong-doers. The bill discloses that certain of the respondents have entered into a conspiracy to commit the illegal acts charged. These acts will affect the entire state. Individuals cannot invoke the power of a court of equity to enjoin these acts, but the state, in its sovereign capacity as *parens patriae* has the right to invoke the power of a court of equity to protect its citizens when they are incompetent to act for

themselves. The state is not bound to wait until the object of the illegal combination is effected which will deprive the people of their liberties and constitutional rights, but may bring an action at once to prevent its consummation; and, while the writ of injunction may not be employed to suppress a crime as such, yet when acts, though constituting a crime, will interfere with the liberties, rights and privileges of citizens, the state not only has the right to enjoin the commission of such acts, but it is its duty to do so.—*In re Debs*, 158 U. S. 564; *Attorney General v. R. R. Co., supra; State v. Houser*, 100 N. W. 964; *Attorney General v. Blossom*, 1 Wis. 317; *Columbian Athletic Club v. State*, 40 N. E. 914; *Louisville N. R. Co. v. Commonwealth*, 31 S. W. (Ky.) 476; *Commonwealth v. McGovern*, 66 L. R. A. (Ky.) 280; *People v. Truckee Lumber Co.*, 116 Cal. 397; *In re Court of Honor*, 85 N. W. (Wis.) 497.

In the celebrated Debs case, *supra,* Mr. Justice Brewer, after discussing the interest which the government had in the action, out of which the proceedings for contempt against Debs arose, and having reached the conclusion that the government had a property right to protect, said:

"We do not care to place our decision upon this ground alone. Every government, entrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one, and the discharge of the other; and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and to prevent the wrong-doing of one resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court."

It is a favorite argument of wrong-doers to assert that an attempt to prevent them from committing criminal acts will invade their constitutional rights. Such an argument is specious. If carried to its logical conclusion, it would mean that the constitution protects parties in the commission of crimes against the sovereign state when it is sought to prevent their wrongful acts of a character that the interests of the state and the rights of its citizens are thereby injuriously affected. The respondents are, in effect, asserting that if they disobey the injunction, they will be guilty of a crime, as well as contempt. If they obey the injunction demanded, they will obey the law, and the injunction will not deprive them of any right. If they disobey the writ, they have only their own insubordination to answer for. They certainly have no right to commit the acts which are sought to be enjoined, and if they obey the law and observe the oaths which they are required to take, they will not be subjected either to a charge for contempt, or the commission of a crime. The right of trial by jury does not extend to charges for contempt. A court having jurisdiction to issue an injunction has the inherent power to punish for contempt those who violate its mandates. If such violation constitutes a crime, the court, by punishing for contempt, is not executing the criminal laws, but only securing to suitors the rights to which it has adjudged them entitled.—*In re Debs, supra; Eilenbecker v. Plymouth County,* 134 U. S. 31; *Attorney General v. R. R. Co., supra.*

This question of the right of trial by jury has frequently received the attention of the courts in cases where authority was specially conferred upon, or exercised by, a court of equity to enjoin the continuance of a nuisance, with the result that practically the unbroken trend of authority is to the effect

that laws authorizing such actions to be maintained do not invade constitutional rights.—*State v. Saunders,* 66 N. H. 39; *Carlton v. Rugg,* 149 Mass. 550; *Littleton v. Fritz,* 65 Iowa 488; *Mugler v. Kansas,* 123 U. S. 623; *Commonwealth v. McGovern, supra.*

'These decisions are based upon the proposition that jurisdiction conferred upon a court of equity to abate nuisances can be lawfully exercised, and that conferring such jurisdiction does not deprive those maintaining such nuisances of the constitutional guaranty of the right of trial by jury.

The state has no interest in the success or defeat of any political organization. It is immaterial that it appears from the averments of the bill that one political organization is in control of the election machinery provided by law, and will employ illegal means to the detriment of the other; nor is it material that private relators are named who are candidates of the Republican party, and that respondents are engaged in a conspiracy which will result in fraudulently depriving the Republican candidates of votes, and give to the candidates of the Democratic 'ticket fraudulent and fictitious votes.' These are but incidents by which it is made to appear that the elections will be dishonestly and fraudulently conducted, so that the ballots cast by the legal voters will not be counted as they should be, or have the effect they should have, because of frauds.

A political right is defined to be "a right exercisable in the administration of government."—Anderson's Law Dict. 905. This proceeding does not contemplate that the respondents shall be deprived of the exercise of any function imposed upon them by law. It is not intended that they shall be required to perform any act which interferes with their duties as defined by the law relating to elections, but, on the contrary, it is only sought to compel them to obey

this law. The prevention of frauds which it is charged they intend to commit may have a political effect, in the sense that the success or defeat of a political organization may be affected, but that does not make the questions presented political instead of judicial. The action is not to have this court exercise functions which belong to any other department of government, but merely to construe the law relative to the duty of the respondents and the power of the state to execute its laws, and to command obedience to them. The questions presented by the bill are, therefore, purely judicial.—*State v. Houser, supra; State ex rel. Lamb v. Cunningham,* 83 Wis. 90.

The final proposition presented by the questions under consideration is the jurisdiction of this court. Having reached the conclusion that the state, in its sovereign capacity, has the authority by a suit in equity to enforce its laws and command obedience to them when necessary for the protection of the rights and liberties of its citizens, the question of the jurisdiction of this court is limited to its authority in an original proceeding like the one at bar. The constitution (section 3, article VI) recites that the supreme court "shall have power to issue writs of *habeas corpus, mandamus, quo warranto, certiorari,* injunction, and other remedial writs, with the authority to hear and determine the same." At quite an early date this provision was considered by this court in *Wheeler v. N. C. I. Co.,* 9 Colo. 248. In that case it was held that original jurisdiction was, by the constitutional provision referred to, conferred upon this court by virtue of the authority to issue the writs mentioned, for the purpose of protecting the sovereignty of the state, its prerogatives and the liberties of its citizens.

Wisconsin has a constitutional provision which is the exact counterpart of our own. The supreme

court of that state, in considering and defining its purpose, has held, in effect, that it was designed to make that court one of first resort on all judicial questions affecting the sovereignty of the state, its franchises and prerogatives, or the liberty of its citizens. It was said that the writs mentioned were prerogative "because these are the very armor of sovereignty. Because they are designed for the very purpose of protecting the sovereignty and its ordained offices from invasion or intrusion, and also to nerve its arm to protect its citizens in their liberties, and to guard its prerogatives and franchises against usurpation."—*Attorney General v. Blossom, supra; Attorney General v. R. R. Co., supra; State ex rel. Lamb v. Cunningham, supra.*

The supreme court of Missouri, in *Vaile v. Dinning,* 44 Mo. 210, thus expresses itself with respect to a constitutional provision similar to our own:

"There may be occasions when not only the interest of the citizens, but the safety and welfare of the state, may depend upon the issuance from this tribunal of its original remedial process, and for such exigencies this provision was made."

The supreme court of Arkansas, in *State v. Ashley,* 1 Ark. 309, in considering a constitutional provision conferring upon the supreme court original jurisdiction, and which bears a striking resemblance to our own, announced that it was apparently the intention of the constitutional convention "to leave with the inferior tribunals the first, or original, cognizance of cases and controversies between private parties, as well as all controversies in which the state might be a party or otherwise interested in which the sovereignty, or sovereign rights, powers and franchises of the state are not involved, but in cases involving the civil rights of the sovereign power of a state, affecting vitally its character and the proper

administration of the government itself, in which the whole people and every individual member of the community has a direct, immediate, and most sacred interest, when the exercise of a public right or a public franchise is the subject-matter of controversy, the convention appears to have entertained a different view, and to have deemed it a proper subject to be investigated and determined in the first instance, before the highest judicial tribunal in the state."

The final question relates to the effect of the denial of the equities of the bill. Denials of the averments of a bill upon which the right to injunctive relief is based do not necessarily demand the refusal of the writ. The comparative injuries which may result to the contending parties by granting or refusing it may be considered.—1 High on Injunctions, sec. 13; *Everett v. Tabor,* 46 S. E. (Ga.) 72; *Charles v. City of Marion,* 98 Fed. 166.

Denials may also be disregarded when the respondents do not assert a right to commit the acts sought to be enjoined.—*Herzog v. Fitzgerald,* 77 N. Y. Supp. 366. Applying these rules, it is apparent that the denials of the equities of the bill are wholly immaterial. If the frauds committed in the conduct of an election are such that the legal cannot be separated from the illegal votes, then the honest voters in the precincts where frauds of this character are committed are disfranchised, because of the impossibility of determining what that vote may have been. The respondents certainly have no right to commit the grossly illegal acts which the people seek to prevent, and no injury can result to them from the issuance of a writ which does no more than require them to obey the law.

The writ will issue, as prayed.

STEELE, J., dissents.

The decision in this case was announced prior to April 5th, 1905.

*On Motion to Restrain the Election Commission from*
*Canvassing Returns from Certain Precincts*
*and to Exclude such Returns in Making*
*up the Official Abstract of Votes.*

CHIEF JUSTICE GABBERT delivered the opinion of the court.

The injunction in this case, as indicated by the preceding opinion, was duly issued and served upon respondents prior to the election. After the election proceedings in contempt were instituted against certain of these parties. At their trial it developed that they had disobeyed the mandates of the writ by the perpetration of gross frauds, for which they were adjudged guilty of contempt. The facts upon which such conclusions were based are substantially as follows:

In precinct 8, ward 7, none of the ballots cast were counted, but in their place and stead ballots were substituted which were returned and certified.

In precinct 10, ward 7, upwards of two hundred ballots were introduced into the box after the polls were closed, which ballots were counted and certified as having been duly cast.

In precinct 8, ward 5, the election officials knowingly and willfully permitted repeating to such an extent that it was impossible to determine the number of votes so fraudulently cast.

In precinct 7, ward 5, an examination of the ballot box disclosed that upwards of one hundred and fifty ballots were written by one person, and that the election officials knowingly and willfully permitted repeating.

In precinct 6, ward 5, repeating was also knowingly and willfully permitted by the election officials, it appearing that in some instances the same person voted as many as eight times.

In precinct 9, ward 5, after the polls were closed, the election officials mingled with the ballots cast a large number of false, fictitious and spurious ballots, which were subsequently counted, returned and certified by them.

In precinct 3, ward 4, the election officials also permitted repeating. The same is true with respect to precincts 1 and 2 of this ward.

In precinct 13, ward 3, in addition to the election officials knowingly and willfully permitting repeating, it appears that over eighty ballots were found in the box so folded that they could not have been introduced through the slot; that those ballots were counted and certified, and it also appeared that, according to the returns made, there had been a willful miscount of the votes found in the box.

In brief, it appeared from the facts established in the contempt proceedings, that the returns made by the election officials of the precincts mentioned were false; that in no instance did they represent the *bona fide* vote cast in either of these precincts; that this vote could only be determined by an investigation independent of the returns; that the respective election officials had knowingly and willfully committed frauds through which these results were accomplished, and that these several acts were in violation of the mandates of the injunction issued. After these proceedings the people, through the attorney general, moved for an order directing the election commission to exclude the returns from these precincts in making up the final abstract of votes. In opposition to this motion it is contended that an order of the character demanded will disfranchise the peo-

ple of the precincts embraced in the motion; that such an order will be an interference with the duties of the commission, because by law they are required to canvass the returns in the first instance; that it will affect candidates who were not parties to the original proceeding, and are not before the court on this motion, and that title to an office can not be determined, or a contest inaugurated, in the manner contemplated by the motion. None of these questions are involved. Sustaining the motion will not disfranchise the voters in the precincts mentioned. If they have been disfranchised, it is because of the fraudulent acts of election officials. The motion does not make a case of an election contest, nor does it involve title to an office, so that candidates are neither proper nor necessary parties to the original proceeding, or to this motion. The election commission were parties to the original proceeding, and are parties to this motion. Two of the members of that body were charged with being parties to the fraudulent practices mentioned in the bill, and it now appears that the frauds committed at the election were, in part, at least, consummated by the aid of frauds previously committed in which these members of the commission took part. The only question is the power of a court of equity, after it has assumed jurisdiction of an action to prevent frauds, to effectuate its orders made for the purpose of preventing such frauds. By the writ issued, the court did not assume to do more than require the election officials to discharge the functions which the law requires them to exercise, and to refrain from committing the fraudulent acts which they have committed. The purpose of the original action was to secure an honest election in the precincts in question. Instead of obeying the mandates of the injunction issued for that purpose, the respondents have been guilty of

frauds to an extent and of a character so that it appears the returns made by them are absolutely false, and the truth cannot be deduced from them. When it clearly appears that frauds subversive of the purity of the ballot box have been perpetrated by election officials, or have been perpetrated by others with their knowledge, connivance and consent, of a character and extent that they cannot be disclosed with reasonable certainty, the integrity of the entire return is destroyed, and it must be rejected.—*Londoner v. People,* 15 Colo. 557. The reason for this rule is obvious. In such circumstances the returns are untrue, and the legal votes can only be determined by evidence *aliunde.*

The object of the action was to prevent frauds of the character practiced by the election officials. Having issued a writ of injunction with that end in view, the authority of the court is not limited merely to orders punitive in their nature, but to accomplish the end sought it has the authority to enter orders of a remedial character.—10 Enc. Pl. & Pr. 1114. This doctrine is a familiar one in equity jurisprudence, and is as applicable to an election controversy as any other of which the court has jurisdiction. The object of a punitive order against one violating the injunctive process of a court is to vindicate its authority and insure respect and obedience for its process, while the purpose of a remedial order is to protect the rights of the party for whose benefit the injunction process was issued, and to prevent the party to whom such process was directed from securing an advantage or benefit resulting from its disobedience.—*Bessette v. Conkey,* 194 U. S. 324; 24 Sup. Ct. Rep. 665. This court did not assume jurisdiction of the action instituted by petitioners for the mere purpose of punishing those who might violate its orders, but to prevent fraud. To now limit

our authority to punitive orders would render the action practically nugatory; permit the respondents to commit the frauds inhibited, and leave them standing exactly on the same plane as though no action had been commenced, or process served upon them, save and except that they may be punished for disobeying the orders of the court. Frauds cannot be fully prevented unless the court assuming jurisdiction to prevent them has the power to inhibit advantage being taken thereof where they are committed in violation of its orders. A court of equity has the inherent power to effectuate its orders, and when it has properly obtained jurisdiction of a cause, it will retain that jurisdiction for the purpose of entering such orders as will effectuate the object of the action, although that may require matters to be passed upon of which, standing alone, it could not take cognizance.—*Poole v. Docker,* 92 Ill. 501. So that, while it may be correct that in an original action a court would have no authority to grant the relief demanded by the motion, yet, when it has assumed jurisdiction for a specific purpose, it has the authority, by subsequent proceedings, to effectuate that purpose.

The order demanded will not disfranchise the people of the precincts in question, nor will it deprive candidates of the legal votes cast in their favor if, independent of the returns, the legal can be segregated from the illegal votes. Those are matters which can only be determined by a competent tribunal in case a contest is inaugurated by any of the candidates voted for at the election, to which character of proceeding all persons who are proper and necessary parties would be parties, and thus afforded an opportunity to be heard and fully protect their rights. In brief, then, the purpose of the motion is merely to prevent the respondents from obtaining

any advantage of the frauds committed in violation of the injunction issued. An order to that effect does not disfranchise any voter, or deprive any candidate of the right, in an appropriate proceeding, to establish, by competent evidence, what the legal votes were, and have them counted accordingly. This court, by virtue of the authority resulting from assuming jurisdiction originally, has the inherent power to render its process effectual by undoing frauds committed in violation of the mandates of that process, and preventing advantage being taken of such frauds, so as to protect the party for whose benefit the process issued from being injured by a disobedience of such process.—*People v. District Court,* 29 Colo. 182. The motion will, therefore, be sustained.

*Motion sustained.*

STEELE, J., dissents.

NOTE: The decision on the motion was announced prior to April 5, 1905.

### On Motion.

CHIEF JUSTICE GABBERT delivered the opinion of the court.

The question raised by the motion under consideration is, whether the temporary election commission, in the capacity of a board of canvassers, may, in making up the returns, consider the tally list, or is this board, in making up such returns, limited to the certificate of the precinct election officials? In other words, in case of a discrepancy between the tally list and such certificate, which shall control? Counsel presenting the motion contend that the certificate, alone, can be considered, while on the part of counsel for the election commission it is claimed that the tally list is a part of the returns,

and that such list, as well as the certificate, may be considered by the commission in canvassing the returns.

The election law, after directing the preliminary steps to be taken by precinct election officials in counting the ballots and making up the returns, provides: ''As the judges of election shall open and read the tickets, each clerk shall, upon tally lists prepared for that purpose, carefully mark down the votes each of the candidates shall have received, in separate lines, with the name of such candidate at the end of the line, and the office it is designed by the voter such candidate shall fill.''—3 Mills (Rev.) 1625f1.

The law further provides that: ''As soon as all the votes shall have been read off and counted, the judges of election shall make out a certificate under their hands, and attested by the clerks, stating the number of votes each candidate received, designating the office for which such person received such vote or votes, and the number he did receive, the number being expressed in words at full length, and in numerical figures, such entry to be made, as nearly as circumstances will admit, in the following form:'' Then follows the form, from which it appears that it was the express purpose of the legislature in passing the foregoing provision that the number of votes cast for each candidate should be written out full length, and also in figures immediately following.—1 Mills' Ann. Stats. 1624.

This section further directs that the certificate of the election officials, together with one of the lists of voters and one of the tally lists, shall, on the completion of the count, be enclosed and sealed up, under cover, and directed to the official who has charge of making the canvass.

1 Mills' Ann. Stats. 1626 directs that the canvassing board "shall proceed to open the said returns, and make abstracts of the votes in the following manner:" The direction following makes no reference as to what shall be considered in making this abstract, but is merely directory as to what such abstract shall show for the respective candidates.

1 Mills' Ann. Stats. 1642 also provides that, "If, upon proceeding to canvass the vote, it shall clearly appear to the canvassers that in any statement produced to them certain matters are omitted in such statement which should have been inserted, or that any mistakes which are clerical merely, exist, they shall cause the said statements to be sent by one of their number to * * * the precinct * * * judges * * * from whom they were received, to have the same corrected, and the judges of election * * *, when so demanded, shall make such correction as the facts of the case require, but shall not change or alter any decision before made by them, but shall only cause their canvass to be correctly stated."

Questions affecting elections are of the most vital importance, and one of the important matters to be guarded in the conduct of an election, and one which our legislature has been careful to prescribe conditions in relation to, is the record and return of the vote cast. If the provisions on this subject are open to construction, then they should receive from the courts such an interpretation, if possible, as is most likely to secure the object of their enactment. Tally lists shall be kept during the counting of the ballots by the precinct officials. These lists are intended as a preliminary to the making up of the official returns. They are convenient, and, perhaps, necessary for the use of the judges and clerks in casting up the vote; but, in case of a discrepancy

between the tally lists and the returns written out in words, which shall control? It is hardly reasonable to presume that it was the intention of the general assembly, in case of such discrepancy, to leave it to the members of the canvassing board to adopt whichever result might be most in harmony with their political affiliations or personal preferences. Such a construction would open the door to the perpetration of frauds. An intelligent interpretation of our statutes on the subject of canvassing votes requires that where there is a discrepancy between the tally list and the certificate proper, that the canvassers shall be bound by some rule that is reasonable and certain, and not subject to variation according to the discretion of the board of canvassers.—*People ex rel. Noyes v. Board of Canvassers,* 126 N. Y. 392. The law does not state that the board of canvassers shall not consider the tally list, and that the canvass shall be limited to the certificate. If, however, the tally list may be resorted to by the canvassers and their canvass based upon such lists rather than upon the certificates, then the lists are, in effect, to be regarded as controlling, or as the best evidence of the count made by the precinct election officials. The legislature has required a certificate to be made by the judges and clerks of election in such form that it could not be changed except it would show evidence of having been tampered with. In the face of this provision it certainly was not the purpose of the general assembly to allow mere tally sheets, which are not certified, which contain nothing more than strokes of pen or pencil with respect to the number of votes cast for any candidate, and which can be readily changed, to be taken as evidence sufficient to contradict the certificates in case of a discrepancy between such certificates and the tally sheets.

One line of authorities cited by counsel hold that tally sheets may be considered in connection with the certificates, because they are part of the returns, while another line holds that such sheets cannot be considered, because they are not a part of the returns. It will be observed that the decisions in those cases are based upon the assumption that the tally lists. do or do not constitute a part of the returns. We do not think those authorities are applicable, because our statutes on the subject of returns contemplate that the certificates can only be considered, and that they cannot be changed or altered by the board of canvassers by reference to the tally lists.

Counsel for the election commission rely upon the provisions of section 61, *supra,* which authorizes the canvassers to correct errors which are merely clerical. Mistakes in filling up the certificates cannot be corrected by the canvassers or precinct election officials by reference to the tally lists. Errors of this kind do not come within the provisions of the section relied upon. The result as expressed in the body of the certificates must control.—*People ex rel. Noyes v. Board of Canvassers, supra.* The motion to require the election commission to canvass the returns as shown by the certificates will be sustained.

*Motion sustained.*

STEELE, J., dissenting (orally).

I dissent from the judgment, because, in my opinion, it is unwarranted, without precedent, and directly contrary to the law.

NOTE: The decision on this motion was announced prior to April 5, 1905.